The South Branch Railroad Company et al.

*v.*

·Willard C. Parker.

1. A *street* was opened and dedicated to public use, after which one of the complainants purchased a portion of the land over which the street extended, taking a deed therefor with full covenants of warranty, and completely obstructed the street by making deep excavations for its road and by laying its tracks.—*Held*, that the complainants are estopped from claiming that any portion of the said street was dedicated.

2. Afterwards, the surveyors made return of a public road over the same land, crossing the railroad of complainants, against the recording of which return the complainants filed a *caveat*, and prevailed; and then built a water-tank twelve feet in diameter about in the centre of the said proposed highway.—*Held*, that this, too, works an estoppel.

3. Where part of an alleged way is over a private alley-way owned by two in common, the court will not declare the existence of such alleged way unless both the owners of the private way are before the court.

4. In such case the court would rather presume a license by the absent owner than to declare the use was adverse without his being heard.

5. To establish a by-road from twenty years' uninterrupted adverse enjoyment, there must be a certain well-defined line of travel in the same place over the entire route for all that time.

On bill, answer and proofs.

*Mr. G. H. Large* and *Mr. Benjamin Williamson,* for complainants.

*Mr. H. A. Fluck, Mr. J. A. Bullock,* and *Mr. J. N. Voorhees,* for defendant.

BIRD, V. C.

The complainants, certain railroad corporations and their receivers, filed their bill of complaint, and ask thereby for an injunction requiring the defendant to remove the posts and boards constituting a fence erected by him across what they claim to be a street, and also the dwelling-house now being erected by him on a portion of said street, which they charge is a public street, running to and from their tracks.

The complainants own a railroad running into the village of Flemington, at which point they have passenger and freight depots. Prior to their purchase of the right of way, John G. Reading had opened a street over his land, fifty feet wide, from the south end of the defendant's lot to Church street, over lands which he afterwards conveyed to the railroad company, and had made one or more conveyances of parcels of his land adjoining on said street, and described them as bounded thereon and thereby, showing an intention to dedicate so much of his land to the public use as had then been designated for that purpose by removing fences and fixing the boundaries by the erection of fences from the south end of defendant's lot. It is alleged that it was the intention of John G. Reading to extend the said street northward, over the lot now owned by the defendant, to Mine street,

but he did not do so, as the proof shows, at the time he opened it from the south end of said lot. But it is clear that the street had been opened and a conveyance made calling for it as a street before the railroad company took their title.

It is an important fact that the railroad company accepted a deed from John G. Reading for the right of way across this street, with full covenants of warranty. It is likewise important that they at once made a cut through said street, and laid their tracks across it. It is admitted that these acts completely obstructed the travel over the alleged street. In July, 1864, the company commenced running their trains, and its patrons delivering to it their produce as freight. It is insisted that many of them used the lot now owned by the defendant in passing to and from the depot of the complainants with their horses and wagons.

In the year 1884 the defendant became the owner as tenant in common of the lot over which the way in dispute is said to have been acquired. In 1885 he became the owner of the entire fee, and very soon thereafter erected a fence on the south end, thereof, and also commenced the construction of a house, which was enclosed, roofed and plastered at the time of the filing of the bill. These are the structures upon the part of the defendant which the complainants pray this court to compel the defendant to remove.

In brief, then, the complainants claim that John G. Reading dedicated a strip of land running north and south from Mine street to Church street, and opened it as a street, including therein the lot now opened by the defendant at the northern end thereof, and that he made conveyances, calling for a street thereon, and that after the construction of their road all that portion of the said street south of their road was abandoned, but they insist that all that portion north, not only to the defendant's lot, to which place John G. Reading had opened it as a street, but also all of the defendant's lot, was used by the patrons of the railroad as they pleased.

Another important fact should be noted. That is, John G. Reading never was the sole owner in fee of the defendant's lot,

but held it in common with another.   They purchased it in 1860.
But the complainants urge that the work of dedication was
nevertheless complete because it was immediately thrown open
as part of said street, and that if it was not so thrown open, then
there has been an uninterrupted adverse user for more than
twenty years.

Still another fact must not be lost sight of.   That is, that when
John G. Reading and his cotenant acquired the title to the de-
fendant's lot in 1860, there was secured by deed a right to an
open alley-way twelve feet wide over this and the adjoining lot
on the east, to which easement each lot contributed one-half.

It is important also to bear in mind that within a period of
twenty years application was made for the appointment of sur-
veyors to lay out this very strip of land, all the way from Mine
street over the lands of the defendant and of the complainant
(crossing their tracks of course), and over the lands of John G.
Reading, to Church street.   It is admitted that the surveyors
were appointed, and made a return, laying out a public road
over the alleged street.   But the railroad company filed a *caveat*
against recording the return, and succeeded.   Immediately after-
wards it erected a water-tank ten or twelve feet in diameter,
about in the centre of what they claim John G. Reading intended
as a public street, and also of what the surveyors returned as a
public road.

Two questions are presented:  First, was there an act of
dedication, which included the lot of the defendant, of which
the complainants can take advantage? and second, if not such
dedication, has there been an uninterrupted adverse user of the
whole of the defendant's lot as a public street, or of any certain
and well-defined portion of it, for over twenty years?

First, the complainants can claim nothing by any covenants,
references or descriptions, under which they have title to the
lands covered by the alleged street, or adjoining the same.   The
contrary thereof, rather, is the effect of their deed with its full
covenants of warranty.   By the acceptance of such a deed they
ignore or repudiate the existence of a street which they now claim
had, before that time, been solemnly dedicated to public use,

and with reference to which private individuals had made pur-
chases.   Not only this, but the railroad, as has been said, was so
constructed as to render the use of the street impossible.   Still
more than this, when the public, in a formal manner, according
to law, appealed to the courts to have this street made a public
highway beyond a peradventure, and it is declared by the public
authorities to be necessary to open it as a highway, the railroad
company not only resisted it so as to defeat the public desire,
but at once erected a water-tank in the proposed way, a substan-
tial and permanent structure, and an effectual barrier to the use
of the land as a street.   And this tank stands on the north side
of the tracks of the complainant's road, and on the very land
which, by their bill, they claim was dedicated to the public use
by John G. Reading.   Are those acts consistent with their
present demand?   Would it be equitable for the court to allow
the complainants to destroy or obstruct so much of this street as
may suit their convenience, and claim the benefit of the residue
under the original act of dedication as against all the world?
In other words, do the complainants come into court with clean
hands, and are they entitled to a favorable hearing?   I think
not.   I conclude that the complainants, having by their deed
accepted a conveyance of the fee of the land over which the way
is alleged to have been dedicated, and having obstructed such
way by the construction of their road and the erection of a water-
tank within the limits of such way, are estopped from calling
upon a court of equity to declare that the balance of said street
was dedicated to public use, and from asking the aid of such
court to enjoin others from obstructing it.

I say the complainants are estopped. · I speak only with
reference to them.   I make no mention of the rights of others,
either at law or in equity.

But in case I am in error in the foregoing conclusion, and
notwithstanding it appears that part of the way has been effect-
ually obstructed and destroyed by the complainants, has the alle-
gation that the other portion of the alleged way was dedicated
been sustained.   In my judgment it has not.   It is very certain
that when John G. Reading opened the street from the rear of

the Parker lot he did not remove the fence from the rear of said Parker lot. C. K. J., a highly credible witness, who helped to measure the width of the street and saw the lateral fences erected and the cross-fences taken up, says the fence on the Parker lot was not disturbed. I can see no reason to doubt his statement. It is true that J. W. says he was in the employ of John G. Reading and removed the fence in the rear of the Parker lot in the year 1860 or 1864 or 1865, but his testimony was not so clear nor so distinct as that of C. K. J. Besides, C. K. J. says (and he is not contradicted) that J. W. assisted in removing the other cross-fences, by which he may most honestly conclude at this distant period that his work included the other also.

There is also much other testimony to sustain C. K. J. First. John G. Reading was not the sole owner of the fee of the Parker lot in 1860. He and S. E. purchased it that year, as tenants in common, and there is no pretence that S. E. ever intended to dedicate it to public use. S. E. continued the owner of the undivided one-half until 1871. This of itself is conclusive against the assertion of dedication in 1860.

But, secondly, very many witnesses, who had excellent opportunities for knowing, sustain C. K. J. They give circumstances or incidents, such as repeatedly climbing over the fence in going to and from school, and in going to and from their play at ball, and to and from their neighbors when visiting, and falling off it, after the year 1867, with such detail as to exclude all reasonable doubt of the correctness of their statements, whether we consider the events themselves or the times of their occurrences. One witness says that while resting from ball-playing he was sitting on this fence, and when he went to get off he fell and cut his forehead so badly that the aid of a surgeon was required, and the scar he still carries. Another, in going on an errand for a sick lady, let a bottle of medicine fall, which she thought had broken it. She remarked about it to the sick lady, who said she wished it had broken. Such incidents strengthen the direct assertion. Therefore it is very plain that John G. Reading did not, in the year 1860, as is alleged, remove the fence in the rear of

the Parker lot and thereby dedicate said lot to public use. And there has been no effort to show that he did so afterwards.

Secondly. But the complainants allege that, independently of any act of dedication, the public have enjoyed such an uninterrupted adverse use of this alleged street for twenty years as to secure to the complainants all the benefits of a public highway.

At the very outset, I may say that it seems to me to be impossible for any considerate person to adjudge that all of the Parker lot has been subjected to any such uninterrupted adverse enjoyment. For, to say nothing about the fence on the south end thereof, it has been so plainly proved that there was a fence on the north end of it for many years within the statutory limit (except over six feet of a twelve-foot alley-way), that I need not stop for one moment to balance the testimony. So that if there has been a way established by an uninterrupted adverse user, it must be limited to a very narrow portion of the north end of the lot. And since all the rest of the lot at that end was enclosed by a fence, if a way does exist it must be confined to the said alley-way in entering upon the Parker lot.

At this point a serious hindrance presents itself. So far as the proof extends, all the use of the Parker lot, whether more or less, was gained by entering at the alley-way named. That alley-way was a private alley-way, intended for the benefit and enjoyment of the owner of the Parker lot and the lot adjoining it on the east. By express stipulation, it was to an *open* alley-way. Both lots were at one time owned by the same person, and when he conveyed the Parker lot he secured to each lot said alley in width twelve feet, imposing one-half on each. Now, I remark that if a way of any kind has been proved, it must, in part, be over this private right of way or *alley*. And the hindrance referred to is the absence of the owner of the one-half of the alley-way from these proceedings. He has not been brought into court. As the facts are, how can I advise a decree against him? Or, how can I advise a decree which will be ineffectual, unless it be against him? No consideration of the case has been presented to me which overcomes this difficulty.

But if it be said that the use being proved, the presumption is

either an acquiescence or a grant, still, he has a right to be heard. If any presumption arises, it would be as fair to presume that the persons using the way did so by the *license* merely of the other joint owner, or did so when in or about his business. See *Washb. on Ease.*, §§ *133, 143, 144; Brinck* v. *Collier, 56 Mo. 160; Hemingway* v. *Chicago, 60 Ill. 324; Hall* v. *McLeod, 2 Metc. (Ky.) 98.*

Passing on, I do not find a twenty-year adverse user in a legal sense. If the witnesses referred to already be believed, the south end of the Parker lot was obstructed by a post-and-rail fence as late as 1869, and if two other most reputable witnesses be believed, later still they encountered obstructions at different times which hindered them from entering upon said lot from the south.

There were gates at the northern end of the alley-way, and a great deal of time was spent in an effort, on the one side, to show that they were closed within the twenty years, and, on the other, that they were not. If the latter, I do not see that any inference follows, since by deed the alley would be an open one. Of course, if closed, the act of closing would be a denial of the public right, and a prevention of the operation of the statute. There does not seem to be any doubt but that one or both of the gates was or were closed within twenty years.

Again, it is urged that twenty-eight witnesses called by the complainant have sworn to the use of this alley-way and this Parker lot ever since the construction of the railroad in 1864. Certainly, a large number of these witnesses swear that they used this alley-way and this lot from the period named whenever they had occasion to do so, without interruption. I believe them. One witness is contradicted. Another says he often opened the gates for him. It is not necessary that I should attempt to settle or harmonize this difference. Suffice it to say that a great many witnesses passed in and out of this gate-way at different times.

The material questions are, on this head, Where did they make their exit from the lot, and enter upon it, at the end opposite

the gates ? And also, Where did they travel, after passing the gate-way, in reaching the other end ?

These important questions have not been settled by the proof offered. There is nothing which shows a well-defined line of travel at the south end of the lot for twenty years. As I have stated, the proof satisfies me that there has been a post-and-rail fence across that end of the lot within twenty years. What then ? Are all these witnesses called by the complainant to be discredited ? Not at all. For there was a way to reach the depot, the place to which they were going, without going over the south line of the Parker lot. That lot was only fifty feet wide. A portion of the lot adjoining on the west was unfenced both on the east and south lines. This is the proof. One witness swears to it very clearly, and the owner of the lot says that when he fenced his lot on the east line, in 1876, he also put a fence on the south line. Now it was easy enough for those who went to that depot to pass around the west end of the fence on the Parker lot, and not cross the south line at all. Especially may this view be taken when it appears, by all the proof, that there was a way, greatly traveled for several years, over that part of the said lot west of the Parker lot, which way led directly to the depot. And yet, while this view reconciles what otherwise seems to be in hopeless contradiction, there is not a single witness who testifies that the travel took any such route.

Therefore, it is only left for me to consider whether or not there was a well-defined way over the Parker lot for over twenty years. This branch of the case is also, as I think, against the complainants. No one, however skillful, could take the testimony and from it lay a road and say it had been traveled in that particular line for twenty years.

One witness says they went up the alley-way to the tie-post and then broke off and went as they pleased. Another says they went half-way up the alley-way, which would be perhaps an hundred feet further than the tie-post, and then went across the Parker lot. Another says he would go up the alley-way to the barn, and then out to the railroad grounds. Another says he drove anywhere, just where he could find the best road.

32

Another says he didn't remember going any other way than going up the straight line, which would be up the alley-way. He said he used to cart ties up there and wood also, and went up the straight line. When afterwards pressed by the complainants' counsel, he said he went in at the corner (meaning the alley-way), and when "we got in we went pretty much as we pleased." And still another witness said, "We didn't always go in one place; an apple-tree stood there, but I can't tell on which side we drove."

Manifestly, if the complainants' witnesses cannot more clearly define the alleged way, it would seem to be quite useless for the court to declare that there has been one in any given place for over twenty years. It might be safe for me to say that there has been some travel over the lot in question somewhere, but precisely where I cannot tell, and this I regard as absolutely essential. He who claims an easement over the land of another, by the uninterrupted adverse enjoyment thereof for over twenty years, must show that such adverse enjoyment has been in the same place for the period of time required.

The complainants' bill should be dismissed, with costs, and I shall so advise.